# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **VICTORIA L. HARKINS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION** |
| v. ) | |
| ) | **No. 04-2415-KHV** |
| **JO ANNE B. BARNHART,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

## MEMORANDUM AND ORDER

Victoria L. Harkins appeals the final decision of the Commissioner of Social Security to deny her disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. This matter is before the Court on plaintiff's Motion For Judgment (Doc. #6) filed January 13, 2005. For reasons set forth below, the Court sustains plaintiff's motion in part.

## Procedural Background

On October 11, 2000, plaintiff filed with the Social Security Administration her application for disability benefits. She alleged a disability onset date of September 12, 2000. Plaintiff's benefit application was denied initially and on reconsideration. On December 11, 2003, the administrative law judge ("ALJ") concluded that plaintiff was not under a disability as defined in the Social Security Act and that she therefore was not entitled to disability benefits. On July 2, 2004, the Appeals Council denied plaintiff's request for review. The decision of the ALJ stands as the final decision of the Commissioner. See 42 U.S.C. § 405(g), § 1383(c)(3).

**Factual Background**

The following is a brief summary of the evidence presented to the ALJ.

Victoria L. Harkins was born on January 14, 1959. Transcript Of Proceedings Before The Social Security Administration ("Tr.") at 296, attached to defendant's Answer (Doc. #2) filed November 12, 2004. At the time of her hearings before the ALJ, plaintiff was 44 years old. Id. Plaintiff has earned a GED.

Plaintiff suffers from Sjogren's syndrome,[1] rheumatoid arthritis, peripheral neuropathy in the left lower extremity and both upper extremities, left median nerve neuropathy and "mild" chronic obstructive pulmonary disease ("COPD"). Tr. 18.

**I.     Medical History**

On October 4, 2000, plaintiff reported to the University of Kansas Medical Center ("KUMC") with complaints of weakness and pain in her hands. Tr. 200. She was assessed with Sjogren's syndrome, bilateral carpal tunnel syndrome, increased angiotensin converting enzyme (ACE) and uterine fibroids. Tr. 203. On October 12, 2000, plaintiff had an abdominal hysterectomy and bilateral salpingo-oophorectomy. Tr. 162. Dr. Kermit Krantz, the attending staff physician, reported a final diagnosis of uterine leiomyomata, menometrorrhagia and anemia. Tr. 163.

On October 25, 2000, plaintiff saw George Varghese, M.D. for an electromyographic (EMG)

---

[1]     Sjogren's syndrome is "a symptom complex of unknown etiology, usually occurring in middle-aged or older women, marked by the triad of keratoconjunctivitis sicca with or without lacrimal gland enlargement, xerostomia with or without salivary gland enlargement, and the presence of a connective tissue disease, usually rheumatoid arthritis but sometimes systemic lupus erythematosus, scleroderma, or polymyositis." Dorland's Illustrated Medical Dictionary 1832 (30th ed. 2003).

examination. Tr. 191-94. He noted that

> she does have a mild generalized neuropathy as evidenced by nerve conduction studies, especially sensory, in both upper extremities and the left lower extremity. However, she had significant denervation along the left median nerve, both in the forearm and hand. This is far out of proportion to other mild changes seen in other nerves.

.
Tr. 194. Dr. Varghese stated that this was more likely a mononeuritis[2] involving the median nerve rather than an entrapment type of problem. Id.

On November 8, 2000, Jatinder S. Aulakh, M.D. re-evaluated plaintiff at the KUMC rheumatology clinic. Dr. Aulakh noted that "patient was emotional and was complaining about paresthesia and pain involving her left hand and left lower extremities." Tr. 185. Examination showed no evidence of active synovitis, an unremarkable neurologic exam without evidence of sensory loss and full range of motion of all joints.[3] Id. Dr. Aulakh's assessment was (1) Sjogren's syndrome, (2) mild bilateral parotitis (stable), (3) status post hysterectomy secondary to uterine fibroids (stable), (4) mononeuritis (left median denervation) and (5) mild peripheral neuropathy involving upper and lower extremities. Tr. 186. Dr. Aulakh increased the dosage of methotrexate IM injection and Neurontin to address plaintiff's underlying neuropathy pain. Id. Dr. Aulakh noted that plaintiff should be excused from work if her symptoms got worse. Id. On December 13, 2000, plaintiff saw Dr. Aulakh for a follow-up visit and reported that her neuropathic pain had decreased since the previous visit. Tr. 181.

On December 30, 2000, plaintiff saw Dr. Kamran Riaz for a consultative examination. Tr. 170.

---

[2] Mononeuritis is a "disease of a single nerve." Dorland's Illustrated Medical Dictionary 1171 (30th ed. 2003).

[3] Synovitis is "inflammation of a synovium; it is usually painful, particularly on motion, and is characterized by a fluctuating swelling due to effusion within a synovial sac." Dorland's Illustrated Medical Dictionary 1839 (30th ed. 2003).

Dr. Riaz reported a history of Sjogren's (diagnosed in 1997) and noted that plaintiff complained of pain in the hands and feet with intermittent swelling. Dr. Riaz found no evidence of inflammatory change, hyperthermia or erythema. Id. Dr. Riaz reported that "'[g]ait and station are stable. There is mild-moderate difficulty with orthopedic maneuvers." Id. Dr. Riaz noted no difficulty getting on and off the exam table, mild to moderate difficulty with heel and toe walking, and mild difficulty squatting and rising from the sitting position. Id. At the time of the examination, plaintiff was taking the following medications: Hydroxychloroquine, B-6, Salagen, folic acid, Neurontin, Vioxx and Claritin. Tr. 168. Lab results showed that plaintiff had a rheumatoid factor of 1151.1 (reference range from 0.0 to 13.9) and a sedimentation rate of 36 (reference range from 0 to 20). Tr. 171.

On February 14, 2001, plaintiff returned to KUMC for a follow-up visit. Tr. 177. The doctor noted that plaintiff's hands were somewhat better, that her Sjogren's symptoms were fine, and that her neuropathic pain was improved. Id. Physical examination revealed that plaintiff's fingers were swollen bilaterally. Tr. 179. Her assessment included a diagnosis of rheumatoid arthritis. Tr. 180. On a follow-up visit on May 16, 2001, plaintiff reported pain and swelling in the bottom of both feet, morning stiffness for 15 minutes, less numbness and tingling, less dry mouth and a "good" level of energy. Tr. 173. Upon physical examination, plaintiff had enlarged parotid and submandibular glands bilaterally but no lymphadenopathy. Tr. 175.

On September 19, 2001, plaintiff returned to KUMC for a follow-up visit. Tr. 270. She reported itchy eyes, tenderness in her hands and feet, right sided extremity pain and a swollen left axillary lymph node. Id. Physical examination revealed mild parotid and mandibular gland swelling and right ankle edema

(likely inflammatory). Id. Tinel's sign[4] was negative and cranial nerves were intact, but sensation was decreased on the medial aspect of both feet. Id. Assessment of her condition was noted as "stable." Id.

On January 14, 2002, plaintiff went to KUMC for a surgical consult with Romano Delcore, M.D. A routine mammogram had revealed axillary lymphadenopathy, but Dr. Delcore did not believe there was a good indication for lymph node biopsy. Tr. 265.

On February 6, 2002, plaintiff returned to KUMC for a six-month follow-up visit. Tr. 261. Physical examination revealed large lymph noes, parotid enlargement bilaterally, chest rash, mild edema in lower extremities bilaterally and flexion contraction of the left arm. Tr. 263. The doctor prescribed Plaquenil and Altace. Tr. 264.

On April 10, 2002, plaintiff had a chronic leukemia/lymphoma panel which revealed no immunophenotypic evidence of a neoplastic lymphoproliferative disorder. Tr. 251.

On May 1, 2002, plaintiff returned to KUMC. She reported swelling in her knees, joint pain, dry eyes, dry mouth and a worsened rash. Tr. 246. Physical examination revealed parotid enlargment bilaterally. Tr. 247. Methotrexate was prescribed and Plaquenil was discontinued. Tr. 249.

On August 21, 2002, plaintiff returned to KUMC. She reported continued but improved numbness and tingling in her fingers and feet. Tr. 239. She noted that Vioxx "works well – helps swelling in knees/feet" and reported some pain and decrease in both strength and range of motion. Id. Physical examination revealed enlarged parotid and submandibular glands, hyper pigmented skin on neck, basilar

---

[4] Tinel's sign is "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve." Dorland's Illustrated Medical Dictionary 1703 (30th ed. 2003).

wheezing in chest, reduced sensation in both hands and feet and some edema in the hands. Tr. 240-41.

On February 19, 2003, plaintiff returned to KUMC with complaints of parasthesias in her hands and feet and some arthralgias of the hands and knees. Tr. 233. She did not report morning stiffness or red, hot or swollen joints. Id. Physical examination revealed no rashes, no evidence of active synovitis and good range of motion. Id. Dr. Singh recommended an increase in Neurontin. Tr. 234.

On June 25, 2003, plaintiff returned to KUMC. Tr. 280. She reported that she was not doing well and had developed a rash. Id. She continued to experience numbness and tingling in her feet and fingers, with swelling in the joints of her hands and feet. Id.

On September 3, 2003, plaintiff returned to KUMC, Tr. 288, where she reported numbness and tingling in her feet and fingers, but stated that Neurontin was helping and symptoms were not worsening. Id. Her methotrexate and Neurontin were increased.

## II. Testimony And Daily Activities

### A. Plaintiff

Plaintiff testified that she has been disabled since September 12, 2000. Tr. 296. She experienced loss of use of her hands, had trouble walking and could not eat anything. Id. Plaintiff testified that as of the date of the hearing, she was taking the following medications: Neurontin, Vioxx, Salagen, Altace, methotrexate, Allegra, B6 vitamins and a multi-vitamin. Tr. 297-99. As side effects of the medication, she reported rashes and bruising, double vision and dryness of mouth. Tr. 299, 307. Plaintiff testified that if she stands for a long period of time, her legs become numb and she experiences a burning sensation under her feet. Tr. 299-300. She testified that she is able to stand no longer than 10 to 15 minutes at a time and can walk only two to three blocks. Tr. 300. She cannot sit more than 20 to 30 minutes without getting up

to walk and stretch. Id. Plaintiff experiences stiffness in the joints in her feet in the morning, tenderness in her hands and feet and swelling in her ankles. Tr. 308. Plaintiff testified that she spends most of her day with her feet elevated; otherwise she experiences throbbing, numbness and tingling with sharp twinges of pain. Tr. 310.

Plaintiff testified that she had worked as a payment research specialist. She could no longer perform this job because it required walking and the cold air conditioning was not good for her. Tr. 302. Plaintiff testified that her daily activities included reading, watching TV and washing a few dishes. Tr. 303. She does chores, including cleaning, grocery shopping and cooking. Id. She attends church and bible study and occasionally goes to a movie or has dinner with a friend. Id. She goes to KUMC for a shot every week and sees her physician every two or three months. Id. As of the time of the hearing, plaintiff had regained her ability to write but still had trouble opening jars and buttoning. Tr. 304.

Plaintiff completed three Activities of Daily Living questionnaires – on October 28, 2000, and January 28 and June 25, 2001. Tr. 96-102, 116-22, 129-35. Plaintiff stated that she lived with her mother, then later with her son. Tr. 96, 129. On her last questionnaire, plaintiff stated that she planned to move in the near future, noting that "I have a new place to live now that I can take care of myself better." Tr. 129. In the first two questionnaires, plaintiff stated that she did not cook, do laundry or housecleaning chores, shop for groceries or drive. Tr. 97-98. She paid her own bills, watched television and read. Tr. 98-99. Initially plaintiff reported that she could not leave home without assistance because she could not drive due to pain in her hands and lack of feeling in her legs. Tr. 99. By the third questionnaire, plaintiff reported that she could drive and was able to leave the house without assistance. Tr. 131, 132. Plaintiff initially stated that she experienced daily pain in her hands and feet which never went away. She later

described her symptoms as "tingling numbness, quick stabbing pain (like a needle)" that occurred daily and lasted for a few seconds. Tr. 102, 122. On the final questionnaire, plaintiff reported that she had learned how to use her right hand and had regained some feeling in her hands and feet. Tr. 130.

### B. Testimony Of Medical Expert Anne Edith Winkler, M.D.

At the request of the ALJ, Anne Edith Winkler, M.D. testified at plaintiff's hearing. Tr. 316-27. Dr. Winkler is board certified in internal medicine and rheumatology. Tr. 316.

Based on her review of the medical records, Dr. Winkler testified that plaintiff suffered from Sjogren's syndrome, rheumatoid arthritis, peripheral neuropathy of the upper extremities, peripheral neuropathy of the left lower extremity, left median nerve mononeuritis and mild COPD. Tr. 317. Dr. Winkler testified that plaintiff's rheumatoid factor is "very high" and that this test is usually not repeated because the test does not vary with treatment. Tr. 319. Plaintiff's SED rate ranged between 36 to 42, while normal rates for plaintiff's age would be 20 or less. Id. Plaintiff's C reactor protein was 40, while normal is less than 5. This indicated to Dr. Winkler that plaintiff has active inflammation on an ongoing basis. Id. Dr. Winkler testified that the record showed swelling in plaintiff's feet but did not mention a need to elevate her feet. Tr. 320.

Dr. Winkler testified that plaintiff could not stand or walk six hours a day but could probably stand or walk two hours a day. Tr. 322. She testified that plaintiff's use of her dominant left hand and arm is limited and that she cannot lift or carry any weight with her left hand only. Tr. 323. She also testified that plaintiff could probably use her right hand four to five hours each day. Id. She noted that plaintiff should be cautious around fumes, odors, dust, gases, temperature changes and humidity. Tr. 324. Dr. Winkler testified that because of potential balance problems, plaintiff should avoid unprotected heights such as

ladders and scaffolds.  Id.

### C. Testimony Of Vocational Expert Richard Sherman

Vocational expert Richard Sherman testified at the request of the ALJ.  Tr. 327-32.  Sherman read the written evidence of record, Tr. 328, and testified that plaintiff's work history included telemarketer, sedentary and unskilled; sorter, light and unskilled; packer, light and unskilled; general office clerk, semi-skilled and light; data entry operator, semi-skilled and sedentary; and most recent work as data entry research specialist, semi-skilled, light and sedentary exertion.  Tr. 328-29.  The ALJ asked Sherman which jobs an individual can perform if she is the same age, education and work experience as plaintiff and can stand and/or walk a total of two hours (but not at the same time), sit six to eight hours and lift five pounds frequently and ten pounds occasionally with both hands; cannot lift or carry with her dominant hand and can occasionally finger and handle with her dominant hand; can lift and carry with her nondominant hand but handling and fingering is limited to four to five hours a day; and cannot work in extreme temperature, dust, fumes, heights, ladders, scaffolding or other dangerous conditions.  Sherman testified that such a person could perform past relevant work as a telemarketer, but that it would take some effort.  Sherman testified that such a person could perform work such as an information clerk and a surveillance systems monitor where there is no use of the hands.  Tr. 329-30.  Sherman testified that a person who needs to lie down more than 30 minutes during the day cannot perform these jobs.  Tr. 331.

## III. ALJ Findings

In her order of December 11, 2003, the ALJ made the following findings:

1. Claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. Claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. Claimant has the following severe impairments: Sjogren's syndrome; rheumatoid arthritis; peripheral neuropathy in the left lower extremity and both upper extremities; left median nerve neuropathy; and "mild" COPD.

4. Claimant's medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. This finding is supported by medical expert testimony.

5. The undersigned finds claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of this decision.

6. Claimant has the following residual functional capacity: can stand and/or walk two hours in an eight hour day; has limited use of her left arm such that she is unable to lift or carry with arm [sic] and can only occasionally finger and handle with the left hand; can use her right hand 4-5 hours a day; needs to avoid working in environments with fumes, gases, and humidity; and cannot work at heights, on scaffolds, or in temperature extremes.

7. Claimant is unable to perform any of her past relevant work.

8. Claimant is a "younger" individual.

9. Claimant has a "high school" education.

10. Transferability of skills is not an issue in this case.

11. Considering claimant's vocation profile, age and education, and residual functional capacity, she can perform a limited range of jobs, but these jobs exist in significant numbers. This finding is based on vocational expert testimony.

12. Claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(f)).

Tr. 21-22.

## Standard Of Review

The ALJ decision is binding on the Court if supported by substantial evidence. See 42 U.S.C. §

405(g); Dixon v. Heckler, 811 F.2d 506, 508 (10th Cir. 1987). The Court must determine whether the record contains substantial evidence to support the decision and whether the ALJ applied the proper legal standards. See Castellano v. Sec'y of HHS, 26 F.3d 1027, 1028 (10th Cir. 1994). While "more than a mere scintilla," substantial evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Evidence is not substantial "if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." Knipe v. Heckler, 755 F.2d 141, 145 (10th Cir. 1985) (citation omitted).

## **Analysis**

Plaintiff bears the burden of proving disability under the Social Security Act. See Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989). The Social Security Act defines "disability" as the inability to engage in any substantial gainful activity for at least twelve months due to a medically determinable impairment. See 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is under a disability, the Commissioner applies a five-step sequential evaluation: (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) whether the impairment prevents the claimant from continuing his past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work. See 20 C.F.R. §§ 404.1520, 416.920. If a claimant satisfies steps one, two and three, he will automatically be found disabled; if a claimant satisfies steps one and two, but not three, he must satisfy step four. If step four is satisfied, the burden shifts to the Commissioner to establish that the claimant is capable of performing work in the national economy. See Williams v. Bowen, 844 F.2d 748,

751 (10th Cir. 1988).

Here, under step three, the ALJ found that plaintiff does not suffer impairments which meet or equal any criteria contained in the Listing of Impairments in Appendix 1. Tr. 22. The ALJ found that the medical expert's testimony supported this conclusion. The ALJ next found, under step four, that plaintiff could not perform any of her past relevant work. At step five, the ALJ denied benefits because she found that plaintiff could perform work in the national economy.

In the step five analysis, the ALJ must determine whether – in view of her age, education and work experience – plaintiff has the residual capacity to perform other work in the national economy. Bowen v. Yuckert, 482 U.S. 137, 148 (1987). The ALJ bears the burden of proof at step five. See id. at 146 n.5. To meet this burden, the ALJ must find that plaintiff can perform work "in the claimant's residual functional capacity category." Talbot v. Heckler, 814 F.2d 1456, 1462 (10th Cir. 1987). The ALJ found plaintiff capable of performing a limited range of jobs which exist in significant numbers.

Plaintiff challenges the ALJ decision, arguing that (1) she improperly determined that plaintiff's impairment did not meet or equal listing 14.09A for inflammatory arthritis; (2) she erred in finding that plaintiff's subjective complaints were not fully credible; and (3) she erred in finding that plaintiff was capable of performing jobs which exist in significant numbers in the national economy. Motion For Judgment (Doc. #5) at 13, 16, 18.

**I.     Listed Impairment**

As noted above, the ALJ found that plaintiff has severe impairments. She then proceeded to step three and found that plaintiff does not suffer impairments, singularly or in combination, which meet or equal any criteria contained in the Listing of Impairments in Appendix 1. Tr. 22. In reaching her conclusion, the

ALJ determined that "the objective medical evidence discussed by Dr. Winkler at the hearing and the impairments she found are supported by and consistent with the evidence. . . . [T]he most recent treatment record . . . from claimant's treating rheumatologist, filed after the hearing, shows claimant still had pain and numbness in both hands, left greater than right, but Neurontin was helping and her symptoms were not worsening." Tr. 19-20. Additionally, the ALJ found that plaintiff's joints were stable without evidence of new inflammation and that since the alleged onset of the disability, plaintiff's symptoms had remained stable, she had good range of motion and her energy level is considered good. Tr. 20. Dr. Winkler concluded that plaintiff's condition did not meet or medically equal any of the listed impairments. Tr. 322.

Plaintiff argues that the ALJ finding is not supported by substantial evidence on the record as a whole. Specifically, plaintiff contends that (1) she has rheumatoid arthritis, a listed impairment; (2) medical evidence shows joint pain, stiffness, swelling, generalized neuropathy and a high rheumatoid arthritis factor; and (3) her increased dosages of arthritis medicine suggest worsening of symptoms. Plaintiff argues that this evidence, taken together, suggests a medical equivalence to a listed impairment.

In response, the Commissioner argues that plaintiff has not identified sufficient evidence which supports a finding that plaintiff meets a listing or the medical equivalent. The Commissioner notes that the record contains evidence of joint pain with swelling, tenderness and inflammation as required by the definition, but that these symptoms have not resulted in an inability to ambulate effectively or an inability to perform fine and gross movements effectively as required by the listing. The Commissioner argues that the record contains no medical findings which are comparable in kind or severity to the listed criteria.

Plaintiff's view of the evidence might support a conclusion that her condition meets or equals a listed impairment. The Court, however, will not find error in the ALJ conclusion simply because the evidence

might support a contrary finding. The possibility that two inconsistent conclusions may be drawn from the evidence does not prevent an administrative agency findings from being supported by substantial evidence. Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989) (quoting Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966)). Where the ALJ has reached a reasonable conclusion supported by substantial evidence in the record, the Court will not reweigh the evidence and reject the conclusion of the ALJ, even if it might have reached a contrary conclusion.

Here, the ALJ identified the relevant listing and found that "the objective medical evidence discussed by Dr. Winkler at the hearing and the impairments she found are supported by and consistent with the evidence." Tr. 19. The ALJ acknowledged Dr. Winkler's opinion that "if claimant continues to have more or worse symptoms, it would equal listing 14.09A for joint symptoms." Id. Listing 14.09A states as follows:

> Inflammatory arthritis. Documented as described in 14.00B6, with one of the following: A. History of joint pain, swelling, and tenderness, and signs on current physical examination of joint inflammation or deformity in two or more major joints resulting in inability to ambulate effectively or inability to perform fine and gross movements effectively, as defined in 14.00B6 and 1.00B2b and B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 14.09A (2004).

The ALJ specifically noted that plaintiff's most recent treatment record (from her treating rheumatologist) showed that plaintiff still experienced pain and numbness in both hands, but that medication helped and symptoms were not worsening. Tr. 20. The ALJ pointed out that the exam showed plaintiff's joints were stable without evidence of new inflammation; her symptoms had remained stable; plaintiff had good range of motion of spine, shoulders, elbows, wrists, MCP's, PIP's, hips, knees, ankles and foot joint; and her energy level was "good." Id. The ALJ also stated that the medical record characterized plaintiff's

peripheral neuropathy as "mild." Id. The ALJ relied on the medical examiner's opinion that plaintiff's condition does not meet or equal a medical listing unless she continued to have more or worse symptoms. Tr. 19. Based on these statements, the Court finds that the ALJ reached a reasonable conclusion which is supported by substantial record evidence.

## II. Credibility Of Plaintiff

In reviewing ALJ credibility determinations, the Court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." Casias v. Sec'y of HHS, 933 F.2d 799, 801 (10th Cir. 1991). Credibility is the province of the ALJ. Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1499 (10th Cir. 1992). At the same time, the ALJ must explain why specific evidence relevant to each factor supports a conclusion that a claimant's subjective complaints are not credible. See Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995). Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings. Id. (quoting Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). So long as she sets forth the specific evidence on which she relies in evaluating claimant's credibility, the ALJ is not required to conduct a formalistic factor-by-factor recitation of the evidence. White v. Barnhart, 287 F.3d 903, 909 (10th Cir. 2001); see Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). In making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements. See Social Security Ruling 96-7p, 61 Fed.Reg. at 34486. Rather, the ALJ "may find all, only some, or none of an individual's allegations to be credible." See id.

Plaintiff argues that the ALJ credibility findings are not supported by substantial evidence and that she did not apply the correct legal standard to evaluate plaintiff's testimony. Plaintiff contends that the ALJ

disregarded plaintiff's subjective complaints because they were not fully corroborated by objective medical evidence.

Here, the ALJ found that plaintiff's allegations, including her complaints of pain, were only partially credible because of "discrepancies between the claimant's assertions and information contained in the documentary reports and the testimony of Dr. Winkler at the hearing, the reports of treating and examining practitioners, and her daily activities." Tr. 20. The ALJ stated that she evaluated plaintiff's subjective complaints and allegations in accordance with Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987), but she did not provide any specific explanation as to what portions of plaintiff's allegations she determined were not fully credible. In addition, the ALJ made only one specific statement regarding inconsistency in plaintiff's allegations – "the records show claimant was prescribed Altace for hypertension . . . which is consistent with Dr. Winkler's testimony but inconsistent with claimant's testimony." Tr. 20. The Court is left to draw its own conclusions as to which other portions of plaintiff's testimony the ALJ did not believe and why. The Tenth Circuit requires the Court to remand the case under such circumstances. See McGoffin v. Barnhart, 288 F.3d 1248, 1254 (10th Cir. 2002); Kepler, 68 F.3d at 391-92.

The Commissioner argues that the objective medical evidence regarding plaintiff's physical impairments did not support the degree of limitation alleged. Because the ALJ did not explain which testimony she found credible and how the evidence supported her finding, the Commissioner's argument amounts to a *post hoc* rationalization which the Court may not consider. Knipe, 755 F.2d at 149 n.16. Remand is necessary for the ALJ to perform a proper credibility analysis, explaining which allegations, if any, she finds credible, which allegations she finds incredible, and how the evidence supports the conclusions reached.

### III. Hypothetical Question

Plaintiff argues that the ALJ conclusion that she had the residual functional capacity to perform a limited range of sedentary work was not based on substantial evidence in the record as a whole. Plaintiff argues that the hypothetical question to the vocational expert omitted her complaints of weakness and fatigue which required plaintiff to lie down. As the Commissioner correctly points out, a hypothetical need not include all limitations to which a claimant has testified. The ALJ may restrict her questions to those limitations which she has found to exist based upon substantial evidence in the record. Davis v. Apfel, 40 F. Supp.2d 1261, 1269 (D. Kan. 1999). Because the Court remands the case for a proper credibility analysis, it need not reach plaintiff's objection to the hypothetical question.

### Conclusion

For the reasons outlined above, the Court remands the case for further proceedings for the ALJ to further explain her ruling. In particular, the ALJ should explain which of plaintiff's testimony she found credible and which she found not credible. The ALJ should also link her findings with specific evidence in the record.

**IT IS THEREFORE ORDERED** that plaintiff's Motion For Judgment (Doc. #6) filed January 13, 2005, be and hereby is **SUSTAINED** in part. The Court overrules plaintiff's request for an immediate award of benefits.

**IT IS FURTHER ORDERED** that the Judgment of the Commissioner is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with the memorandum and order.

Dated this 11th day of March, 2005, at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge
